UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------

| | | |
|---|---|---|
| ADRIAN ROCHE, | : | CASE NO. 1:10-CV-1819 |
| Petitioner, | : | |
| vs. | : | FINDINGS OF FACT AND |
| | : | CONCLUSIONS OF LAW |
| CYNTHIA HARTZ, | : | [Resolving Doc. Nos. 1, 4] |
| Respondent. | : | |

-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

After a bench trial, the Court decides this child abduction case brought under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, as implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*.

In addition to other ancillary relief, Petitioner Adrian Roche seeks an order compelling the return of his two minor children—eight-year-old LR and five-year-old AR—from their mother, Respondent Cynthia Hartz, who now lives in America with the children. Roche alleges that Hartz wrongfully removed LR and AR from Australia, Roche's home and the children's place of birth. Hartz effected this wrongful removal, Roche says, by deceptively inducing him to allow Hartz and their children to move to and remain in the United States under the guise that Roche needed to help her elderly mother move from Arizona to Ohio.

Having heard the parties' evidence and arguments, the Court **DENIES** Roche's Petition and

-1-

Case No. 1:10-CV-1819
Gwin, J.

**DENIES AS MOOT** Roche's motion for a temporary restraining order.

## I. Findings of Fact

Adrian Roche and Cynthia Hartz married in Australia in 2001. [Pet'r's Ex. 91 at 3.] Hartz, an American, had been living in Australia since 1997. [Trial Tr. 18:21, Feb. 8, 2011.] The marriage produced two boys, both born in Australia: LR, born December 10, 2002 and AR, born December 5, 2005. [Doc. 42.] The boys received dual citizenship upon petition shortly after birth. [Trial Tr. 162:19-23.]

Hartz lived in Australia from the boys' births until April 2007 when she decided to move to America with LR and AR. Hartz said she wanted to come to America to spend time with her ailing mother and to help move her mother from Arizona to Ohio. [Trial Tr. 164:4-8.] Hartz's mother had been diagnosed with Alzheimer's disease, and Hartz "wanted to spend time [with her] before she forgot who I was." [Trial Tr. 164:4-8.] Hartz said the trip also gave an opportunity for LR and AR to get "reacquainted with their cousins, aunties (and great), uncles, and grandparents on a more 'normal' basis." [Pet'r's Ex. 1.] Although not excited with the idea of his family leaving Australia, the timing of their absence worked for Roche, as well, as he was bogged down at work at the time. [Trial Tr. 22:9-12.]

Even before Hartz and the children first departed for the United States, Roche and Hartz disagreed over how long they would be gone. Roche wanted the trip to America to last six months—the amount of time Hartz needed to move her mother. [Trial Tr. 22:5-8.] Hartz, however, was non-committal. In June 2007, two months before her and the children's planned departure, she emailed Roche and their friends and family to explain why she was relocating to America: "It is the best time for us to come also as [LR] will be in first year in Feb 2009 here [in Australia] and then

Case No. 1:10-CV-1819
Gwin, J.

we are locked into staying put for a few years. Adrian will commute to see us and I will commute the kids every 6 months to [S]ydney. We intend to stay [in America] for a year, but will give it 6 months if it is too hard I will return." [Pet'r's Ex. 1.]

In July 2007, Roche and Hartz visited Cleveland, Ohio in preparation for Hartz's and the children's move. Hartz's sister lives in the Cleveland area and Hartz's parents intended to relocate from Arizona to Cleveland. [Trial Tr. 30:16-21.] Roche and Hartz looked for housing for the family and a school for LR, who was four-and-a-half-years old at the time and was ready to begin school. Impressed with the breadth of therapy services and specialized programs the Orange Schools could offer LR—who suffers from autism and requires individual attention—Roche and Hartz enrolled him in Orange and jointly took a six-month lease on a house within the school district. [Trial Tr. 31:2–8.] Hartz and the children departed for America in August 22, 2007. [Trial Tr. 21:24–22:8.]

Once in America, Hartz started building a network of doctors and physicians for LR and AR. LR began seeing a speech therapist, a vision therapist, an occupational therapist, a psychiatrist, and a person to personally accompany LR throughout his daily school day, among other professionals. [Trial Tr. 191:15–20.][1/] Both boys also regularly saw a local pediatrician. [Trial Tr. 98:13.] In addition, LR started school at Orange and adjusted "quite well." [Trial Tr. 64:19–22.]

In January 2008, six months after their initial move, Hartz asked to extend the stay for six more months. [Trial Tr.41:18–24.] Hartz tempered her request by signaling that she still intended to eventually reunite the family in Australia. To that end, Hartz relayed to Roche that she had located an autism specialist in Australia and had identified an Australian school that could properly

---

[1/] Incongruously, Roche—whose children enjoyed all these state-paid services—testified that he and Hartz discussed temporarily moving from Australia to avoid taxes if the business he was involved with was successfully sold. [Trial Tr. 47:20–48:19.]

Case No. 1:10-CV-1819
Gwin, J.

accommodate LR's needs. [Pet'r's Ex. 28; Pet'r's Ex. 26.] As to AR's future schooling, Hartz emailed the Australian school where AR was pre-enrolled and asked to defer his entrance to February 2009, copying Roche on the email. [Pet'r's Ex. 33.] Roche initially balked at Hartz's request to extend her stay, but reconsidered because "[LR] had . . . fitted into the school . . . and [Hartz's] parents still had not moved," which, according to Roche, was the whole reason for Hartz coming to America in the first place. [Trial Tr.41:25.]

Throughout 2008 the children's acclimation to the United States continued uninterrupted. LR, for example, began meeting with Orange's guidance counselor and other classmates once a week for "lunch bunch," a way for LR to make friends. [Trial Tr. 191:9-13.] LR also started participating in after-school activities such as the drama club, Little Scientists, and soccer. [Trial Tr. 93:4-9; Trial Tr. 93:15-18.] Both boys tried Karate, joined Boy Scouts, and regularly attended church and Sunday School. [Trial Tr. 93:11-15; Trial Tr. 189:5-7; Trial Tr. 188:18-19.] Their informal activities included going over to friends' houses, sledding, and picnics. [Trial Tr. 188:10-14.] Because Hartz's sister and her children lived nearby, LR and AR regularly played with their cousins. [Trial Tr. 189:13-18.]

Throughout 2008, Hartz's mother's condition deteriorated leaving her temporarily unable to move to Ohio. Hartz again asked to remain with the children in America, and once again Roche acquiesced. As Roche explains it, "Obviously I wanted everyone to come home, because that's what we planned to do. That's the basis on which I had allowed these shorter term extensions to go for six months at a time. It was only going to be for another six months, another six months, but the parents weren't moving. So what was I to do?" [Trial Tr. 64:12-18.] Although frustrated that his family had been abroad for so long, Roche continued to support them financially. Hartz's and the

Case No. 1:10-CV-1819
Gwin, J.

kid's expenditures ranged from $12,000 to $25,000 a month, which included things such as rent, household expenses, therapy for the boys, a full-time au pair Hartz had brought from Sydney to Cleveland, and Hartz's horse and hunt-club membership. [Trial Tr. 56:1-21.]

In May 2009, Hartz finally moved her mother from Arizona to Ohio. [Trial Tr. 69:20-21.] With the impetus for Hartz's trip completed, Roche flew to America on October 29, 2009 to visit for a few months and prepare his family for their move back to Australia in December, as was then planned. [Trial Tr. 79:14-19.] Upon his arrival, however, Roche was greeted by a process server, who served him with divorce papers, not by his family. [Trial Tr. 17:6-8.] This turn of events undoubtedly surprised Roche, who just two weeks earlier had received a uncharacteristically pleasant email from Hartz: "I have organi[z]ed a night of [H]alloween stuff at the science museum on Friday night the 30th when you arrive. We can carve pumpkins on Saturday and do trick or treating that night." [Pet'r's Ex. 81.] More telling, however, is the email he received from Hartz the day before he departed for America: "hey, [I] think you should wire 3 months of living expenses. Details: [Key Bank account and routing numbers]. Good luck with the move! Cyndy." [Pet'r's Ex. 85 at 4.]

As part of Hartz's divorce petition, Roche, Hartz, and their lawyers met throughout 2009 and 2010 to negotiate a custody arrangement and parenting plan. [Trial Tr. 84:17-25.] At one particular meeting in May 2009, Roche asked to take the kids abroad on a two-week vacation. Hartz's lawyer agreed on the condition that Roche would waive his rights under the Hague Convention, in exchange. [Trial Tr. 85:10-14.] Roche, of course, responded with the instant petition on August 18, 2010. [Doc. 1.]

## II. Conclusions of Law

### A. The Framework of the Hague Convention

Case No. 1:10-CV-1819
Gwin, J.

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, was ratified by the United States and implemented by means of the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.*, with the goal of preventing parents involved in custody dispute from using the abduction or removal of children from their home jurisdiction as a means of forum shopping.  *See Abbott v. Abbott*, — U.S. —, 130 S.Ct. 1983, 1996 (2010).  Australia, like the United States, is a Hague Convention signatory and contracting state.  *See* Hague Conference on Private International Law, Status Table: 28: Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, (last updated Feb. 17, 2011), http://www.hcch.net/index_en.php?act=conventions.status&cid=24 (last visited Mar. 4, 2011).

The two main purposes of the Hague Convention are "to ensure the prompt return of children to the state of their habitual residence when they have been wrongfully removed," Hague Convention, pmbl., and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States," *id.*, art. 1.  As such, a court adjudicating a petition under the Hague Convention and ICARA must remain mindful of two overriding principles:  "First, a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute.  Second, the Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court."  *Friedrich v. Friedrich ("Friedrich II")*, 78 F.3d 1060, 1063-64 (6th Cir. 1996) (internal citations omitted).

### B. Petitioner Roche's Prima Facie Case

When seeking an order to compel a child's transfer to another Hague Convention country,

Case No. 1:10-CV-1819
Gwin, J.

the petitioner bears the burden of demonstrating by a preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). Article 3 of the Hague Convention defines a "wrongful removal or retention" as an action that breaches the rights of custody of the petitioner under the laws of the country in which the child was a habitual resident immediately prior to the removal or retention.

To show wrongful removal or retention, Petitioner Roche must prove that: (1) the children have been wrongfully removed from Australia or wrongfully retained in America; (2) the children's habitual residence was Australia immediately prior to such removal or retention; (3) the removal or retention breached his custody rights under the law of the children's habitual residence; and (4) he was exercising his custody rights at the time of the removal or retention. *See McKie v. Jude*, 2011 WL 53058, at *5 (E.D. Ky. Jan. 7, 2011). If Roche can establish a prima facie case of wrongful removal or retention cognizable under the Hague Convention, then the burden shifts to Hartz to demonstrate an exception to the general rule that a wrongfully removed or retained child must be returned to the child's country of habitual residence.

**C. Respondent Hartz's Affirmative Defense**

Upon a showing of "wrongful removal," a court must return the child to the petitioner unless the respondent establishes one of four defenses. 42 U.S.C. §§ 11603(e)(2)(A), (B) (grave risk to child if returned to habitual residence; human rights and fundamental freedoms prevent return to habitual residence; child now well-settled in abducted-to country; petitioner was not exercising custody rights at time of removal). A reviewing court applies each exception narrowly. *Rydder v. Rydder*, 49 F.3d 369, 372 (8th Cir. 1995).

In this case, Respondent Hartz raises only the "Article 12" defense, which she must prove

Case No. 1:10-CV-1819
Gwin, J.

by a preponderance of the evidence, 42 U.S.C. § 11603(e)(2)(B). Article 12 of the Hague Convention provides, in relevant part:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Convention, art. 12. Article 12 establishes a one-year limitations period circumscribing the power of a petitioned court. If the petitioner initiated proceedings within a year of the child being wrongfully removed or retained, the court must order the child's return in the absence of some other exception or defense. If a year or more elapsed between the wrongful removal or retention and petitioner's initiation of proceedings, the court need not order the child's return if the respondent establishes by a preponderance of the evidence that the child is "now settled in its new environment."

### III. Analysis

#### A. Date of the Alleged Wrongful Retention or Removal

For the reasons below, the interplay between Petitioner Roche's prima facie case, in which he must prove when the children were wrongfully removed or retained, and Hartz's Article 12 defense, which establishes a one-year limitations period, puts Petitioner in a Catch-22 and leaves the Court unable to grant him relief.

#### 1. Wrongful Retention

Although Roche says otherwise—believing throughout 2010 that he might still resurrect his

Case No. 1:10-CV-1819
Gwin, J.

marriage to Hartz, [Trial Tr. 128:20-23]—the Court finds that Hartz's October 29, 2009 divorce petition put Roche on notice that the abducting parent was not going to return with the children. Thus, because October 29 was the "last date upon which it is undisputed that [the children were] present in the United States with [both parents'] permission," *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291 (3d Cir. 2006), October 29 is the date Hartz's retention became wrongful. Consequently, the burden is on Roche to prove that the children's habitual residence was still Australia on October 29, the date the wrongful retention started. For the reasons below, the record does not support such a finding.

The Sixth Circuit considers a child's habitual residence to be "the nation where, at the time of [a wrongful removal or retention], the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (citing *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995))). This requires the court to focus on whether the child developed a certain routine and acquired a sense of environmental normalcy with the people and places he or she encountered in a country, prior to the removal or retention date. *Karkkainen*, 445 F.3d at 292. Academic activities are among the most central in a child's life and are therefore highly suggestive of acclimatization. *Robert*, 507 F.3d at 996. Moreover, a child's social engagements, participation in sports programs and excursions, and meaningful connections with the people and places in the child's new country all point to acclimatization. *Id*.

In this case, the Court finds that by October 2009—twenty-six months after their arrival—the children's habitual residence had changed from Australia to America. Importantly to this

Case No. 1:10-CV-1819
Gwin, J.

determination of habitual residence, LR and AR came to America when they were four and one years old, respectively, and have continuously resided here since. Neither LR nor AR had attended any school in Australia before coming to the United States. Within a few weeks of their arrival in America, LR was enrolled at Orange. LR was in school essentially full time from his arrival in August 2007 until and after the date of retention, and, by all accounts, had fit in "quite well." The record is somewhat unclear, but it also appears that AR started preschool in 2009. [Trial Tr. 189:2-3.]

LR's counselor at school helped him make friends, including the other participants of the "lunch bunch." LR participated in after-school activities such as drama, Little-Scientists, Boy Scouts, and soccer. Both boys tried Karate and regularly attended church and Sunday School. They routinely played with their cousins. Finally, both boys frequently saw doctors, therapists, and other health professionals in the Cleveland area. These facts establish that the boys would have perceived America to be their permanent residence, rather than "merely a temporary journey" before they returned to Australia. See Robert, 507 F.3d at 997. Accordingly, because the Petitioner cannot show that the children's habitual residence was Australia immediately prior to the wrongful retention, the Petitioner has failed to make out a prima facie case of wrongful retention under the Hague Convention.

### 2. Wrongful Removal

Recognizing the weakness of a wrongful-retention theory, Roche instead alleges that Hartz wrongfully *removed* LR and AR from Australia on August 22, 2007, the day her and the children left for America. [Doc. 56 at 5.] Roche contends that Hartz used misrepresentation to induce him into agreeing to the trip and used ambiguity to extend the stay more than two years, which was originally

Case No. 1:10-CV-1819
Gwin, J.

to last only six months.  [Doc. 56 at 18.]  Accordingly, Roche asks the Court to side-step the typical habitual-residence analysis and discount the time the children spent in America, because, under his theory, such time is after the date of the wrongful removal.

If the Court were to accept this wrongful-removal theory—and it does not—Roche is still faced with Hartz's Article 12 defense.  That is, because more than one year elapsed between the wrongful removal and Petitioner's initiation of this proceeding—here, three years—the court need not order the children's return if Respondent establishes by a preponderance of the evidence that the children are now settled in their new environment.

Despite all notions of fairness, and perverse as it may be, Roche's removal theory actually benefits Hartz, the arguably abducting parent.  Recall that under a wrongful-retention analysis, the Court considered twenty-six months of acclimation in fixing the children's habitual residence.  Here, the Court must factor in the additional ten months the children lived in the United States prior to Roche's Hague petition in determining whether the children are now "settled in their new environment."  And by all indication, the children's connections to America strengthened in the additional ten months between Hartz's divorce petition and the instant action.  Accordingly, even under this line of analysis Roche's argument fails; under either theory the Court concludes that the children have become settled in America such that removal now would cause the children undue disruption.

Finally, the Court addresses *Blanc v. Morgan*, 721 F. Supp. 2d 749 (W.D. Tenn. 2010), cited by the Petitioner for the proposition that the Hague Convention prohibits one parent from unilaterally changing a child's habitual residence using ambiguity to induce the other parent to consent to the child's removal or continued retention.  In *Blanc*, the erroneously court relied on *Mozes v. Mozes,*

-11-

Case No. 1:10-CV-1819
Gwin, J.

239 F.3d 1067 (9th Cir. 2001). In *Mozes*, the Ninth Circuit held that the subjective intentions of the parents are all but dispositive in determining a child's habitual residence. *See id*. at 1076-78. In reaching its decision, the *Mozes* court expressly acknowledged that, by focusing on the subjected intentions of the parents, its analysis is incompatible with the Sixth Circuit's decision in *Friedrich v. Friedrich,* 983 F.2d 1396, 1401 (6th Cir.1993) (" *Friedrich I*"), which had held "the court must focus on the child, not the parents, and examine past experience, not future intentions."

The Sixth Circuit has since reaffirmed *Friedrich I*'s core holding and explicitly disagreed with *Mozes* in *Robert v. Tesson,* 507 F.3d 981, 993 (6th Cir. 2007). Nonetheless, without acknowledging the Sixth Circuit's decision in *Robert*, the *Blanc* court extended *Mozes* in finding that "the Father's failure to insist upon a definite date of return [did not result] in a loss of *his ability* to determine his daughter's habitual residence . . . ." *Blanc*, 721 F. Supp. 2d at 761 (emphasis added). Thus, because *Blanc* relied on precedent at odds with the Sixth Circuit's decision in *Robert*, the Court does not consider *Blanc* persuasive.

### IV. Conclusion

For the foregoing reasons, the Court **DENIES** Petitioner Roche's petition for the return of his children to Australia and **DENIES AS MOOT** Petitioner's motion for a temporary restraining order.

IT IS SO ORDERED.


Dated: March 7, 2011                         s/         *James S. Gwin*
                                             JAMES S. GWIN
                                             UNITED STATES DISTRICT JUDGE